**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph H. Rodriguez |
| | : | |
| v. | : | |
| | : | |
| JOHN GRIER, III | : | Criminal No. 21-524 (JHR) |
| | : | |

---

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTIONS**
***IN LIMINE* AND MOTION FOR RECIPROCAL DISCOVERY**

---

PHILIP R. SELLINGER
United States Attorney
United States Attorney's Office
District of New Jersey

On the Memorandum:
JASON M. RICHARDSON
LINDSEY R. HARTEIS
Assistant U.S. Attorneys
United States Post Office and Courthouse
401 Market Street, Fourth Floor
Camden, New Jersey 08101
(856) 757-5026

Table of Contents

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF FACTS ..................................................................... 1

    A. The Offense Conduct .......................................................... 1

    B. Procedural History ............................................................. 5

ARGUMENT ......................................................................................... 6

I.   THE COURT SHOULD EXCLUDE IMPROPER CHARACTER
    EVIDENCE................................................................................. 6

    A. Evidence of the Defendant's Good Character or Reputation is
       Inadmissible Under Federal Rules of Evidence 404 and 405. .............. 7

    B. If Certain Character Evidence is Permitted at Trial, It Must be
       Limited in Form to Testimony as to the Witness's Opinion of the
       Defendant or the Defendant's Reputation. ......................................... 11

II.  LAY WITNESSES SHOULD BE PERMITTED TO TESTIFY ABOUT
    THE DIRECT OBSERVATIONS AND PERCEPTIONS OF THE
    DEFENDANT'S INTERACTIONS WITH DRUMMOND.............................. 13

III. DESIGNATION OF WITNESSES AS HOSTILE ......................................... 17

IV. THE COURT SHOULD ALLOW REFERENCE AT TRIAL TO THE
    SUBSEQUENT DEATH OF THE VICTIM. ................................................. 19

V.  THIS COURT SHOULD BAR ANY EXPERT OPINION TESTIMONY
    THAT GRIER'S CONDUCT DID NOT VIOLATE DRUMMOND'S CIVIL
    RIGHTS. ...................................................................................... 22

VI. THE COURT SHOULD PRECLUDE ANY REFERENCE TO POSSIBLE
    PUNISHMENT OR COLLATERAL CONSEQUENCES OF CONVICTION..... 23

VII. THE COURT SHOULD ALLOW ADMISSION OF PRIOR GRAND JURY
    TESTIMONY AS SUBSTANTIVE EVIDENCE AS NEEDED. ....................... 25

VIII. THE JURY SHOULD RECEIVE THE INDICTMENT DURING
    DELIBERATIONS. .......................................................................... 28

IX. LAW ENFORCEMENT ATTENDING TRIAL SHOULD BE BARRED FROM
    WEARING UNIFORMS OR OTHER RECOGNIZABLE ITEMS IN THE
    COURTROOM SO AS NOT TO UNDULY INFLUENCE OR INTIMIDATE
    THE JURY .................................................................................... 29

X.   THE DEFENDANT SHOULD BE ORDERED TO PROVIDE
RECIPROCAL DISCOVERY TO THE GOVERNMENT. ............................ 31

XI.  THE DEFENDANT SHOULD BE ORDERED TO PROVIDE PRIOR
STATEMENTS OF DEFENSE WITNESSES TO THE GOVERNMENT
ON THE JENCKS DISCLOSURE DATE. ................................................. 32

CONCLUSION ............................................................................................. 33

## PRELIMINARY STATEMENT

The Government submits this Memorandum of Law in support of its Motions *In Limine* and Motion for Reciprocal Discovery.  The Government respectfully reserves its right to supplement its responses by way of oral argument.

## STATEMENT OF FACTS

### A.   The Offense Conduct

On June 18, 2017, at approximately 5:30 a.m., Bridgeton Police Department ("BPD") Officers were dispatched to the Riggins Gas Station at West Broad Street and Fayette Street in Bridgeton.  The report indicated that there were two males sitting at the gas station yelling at passersby.

When Officer Donald Young (listed in the Indictment as BPD Officer #1) arrived, he found Marty Drummond ("Drummond") in the driver seat of a blue Buick and Alan Campbell sitting in the passenger seat.  Both men appeared to be impaired.  Officer Young also observed an open bottle of Johnny Walker whisky.  However, the hood of the car was cold and the keys were not in the ignition.  Therefore, Officer Young did not have probable cause to arrest Drummond for driving while intoxicated ("DWI").

In response to the radio call, the defendant, Officer John Grier, III, ("the Defendant") arrived as a back-up officer.  The Defendant approached the car to watch the car's occupants as Officer Young returned to his vehicle to prepare summonses for Drummond and Campbell.  As the Defendant was standing near the driver's side door, Drummond opened the door and attempted to get out.

Grier ordered him back into the car and told him to "stay in the vehicle or I am going to spray you."  Up to this point, Drummond was not hostile or aggressive to the Defendant.  From his body worn camera ("BWC"), The Defendant can be seen holding a small can of mace in his hand.  Drummond remained in the vehicle, berated Officer Grier, cursing at him, threatening him and using racial slurs directed at the people in Bridgeton.  Eventually, the Defendant went and stood outside Officer Young's police SUV while he completed the summonses.

The Defendant radioed for Officer Ronald Broomall (listed in the Indictment as BPD Officer #2) to come to the gas station for additional police presence. When Officer Broomall arrived, the Defendant told him that Drummond and Campbell were very argumentative and borderline sovereign citizens.  Officer Broomall saw the OC spray in the Defendant's hand and asked the Defendant "if you want me to get the big one," (a reference to the large can of OC spray that the Department issues for crowd control).

Eventually, Officer Young issued Drummond and Campbell with summonses.  He also told them to get someone who was sober to come pick them up.  Officer Young further warned them that if they drove, then they would be arrested for DWI.

The initial interaction lasted approximately 20 minutes.  The Defendant and Officer Young then drove away from the gas station.  Within minutes, Officer Broomall radioed for assistance at the gas station because Drummond and Campbell had gotten out of the car and approached him before he could drive off.

As the Defendant drove back to the gas station, he had the large can of OC spray in his hand.  Upon arrival, Drummond was yelling non-sequiturs at the officers.  At one point, Drummond asked for a sergeant and the Defendant requested that a supervisor come to their location.  After about 2 minutes, the Defendant ordered Drummond to get back into his vehicle and warned him that if he approached the officers again he would be arrested.

Drummond and Campbell returned to their car.  As the officers were watching, Drummond started the car and drove slowly to the side of the gas station.  At that point the police officers had probable cause to arrest Drummond for DWI.

The officers followed the car.  Once it parked, they moved to arrest Drummond.  Officers Young and Broomall approached Drummond as he got out of the driver's side of the car.  The Defendant got out of his car with the large can of OC spray in his hand.  The Defendant told Officer Broomall to "step back."  Officer Broomall had nearly finished handcuffing Drummond and Drummond was not resisting his efforts.  While holding the OC spray at arm's length, the Defendant asked Drummond "do you want to feel pain, sir?"  Officers Broomall and Young were able to handcuff Drummond behind his back without incident.  When Officer Broomall put Drummond over the hood of his patrol vehicle to search him, Drummond said "ow."  The Defendant responded "good."

After officers searched Drummond and double locked his handcuffs, Officer Broomall told Drummond that he was under arrest and escorted him to

3

the back of his patrol SUV.  Drummond repeatedly asked why he was under arrest.

As Officer Broomall opened the rear door to the patrol SUV, Drummond stood outside the rear seat and asked, "what am I under arrest for?"  Officer Broomall responded, "You were told, now get in the car."  At that point, the Defendant reached past Officer Broomall with the large can of OC spray and sprayed Drummond in the face while yelling "get in the fucking car." (Spray also hit Officer Broomall on the side of the head).  As a result of being sprayed, Drummond doubled over with his head inside the SUV.  Officer Broomall helped Drummond up and sat him on the edge of the rear seat.  The Defendant then sprayed Drummond for a second time.  After the second burst of OC spray to the face, the Defendant asked Drummond "there, how do you like it now? Now get in the God damn car."  This series of events can be seen and heard on the officers' BWC footage.

Drummond was trying to clear the spray from his mouth and nose, and therefore not moving quickly.  The Defendant pushed him into the car saying "get in the fucking car."  The Defendant then told him to pull his legs into the car or "I'm give it to you again."  At this time, Officer Broomall intervened and said, "John back off."  Drummond eventually pulled his legs into the SUV and Officer Broomall drove him to the police station.

The Defendant wrote a Supplementary Investigation Report to explain the use of the OC spray and stated in part:

> Once at the patrol vehicle, Marty [Drummond] was instructed to enter inside. Marty [Drummond] refused and continued to <u>forcefully remain</u>

outside of the vehicle. At this time, I deployed the can of department issued OC spray and sprayed Marty [Drummond] with a short burst. Noticing the spray did not strike Marty [Drummond] in the face and that it did not take immediate effect, I sprayed Marty [Drummond] a second time. This took immediate effect and Marty [Drummond] began getting into the rear of the vehicle. Ptl. Broomall aided Marty [Drummond] from the other side of the vehicle and aided with Marty [Drummond]'s legs. Ptl. Broomall began transporting Marty [Drummond] to the police station . . .

(Emphasis added.)

The Defendant did not mention having shoved Drummond into the back of the police SUV in the above Supplementary Investigation Report or in his Use of Force Report.  Nor did he note the fact that the first spray of mace immediately affected Drummond.

The BWC footage does not show Drummond hitting or kicking the officers, or initiating physical contact with them in any way.

Drummond was charged with resisting arrest/eluding (N.J.S.A. 2C:29-2A(1)).  He eventually pleaded guilty in municipal court and was fined.

On August 31, 2017, BPD found that the Defendant used excessive force during Drummond's arrest and suspended him for 3 days.  He also had to attend remedial Use of Force training.

## B.   Procedural History

On June 30, 2021, a federal grand jury sitting in Camden returned a two-count Indictment ("the Indictment"), Crim. No. 21-524 (JHR), against the Defendant, charging him with deprivation of rights under color of law, in violation of 18 U.S.C. § 242, and falsification of records in a federal investigation, in violation of 18 U.S.C. § 1519.  On July 8, 2021, the Defendant surrendered to federal authorities and was arraigned before U.S. Magistrate Judge Ann Marie

5

Donio.  During the arraignment, the Defendant entered a plea of not guilty.  The Defendant was later released on $50,000 bond.  Pursuant to the current Scheduling Order, trial in this matter is set to commence on October 17, 2022. Docket Entry ("DE") 20.

## ARGUMENT

### I.   THE COURT SHOULD EXCLUDE IMPROPER CHARACTER EVIDENCE.

The Government respectfully requests that the Court enter an order excluding improper character evidence that is unrelated to the charges alleged in the Indictment in this case.  Specifically, the Government anticipates that the Defendant may present evidence or elicit testimony of prior instances of "good conduct" or "good works" related to his position as a police officer with the BPD, including matters such as positive evaluations, awards, commendations, or other community service and accolades he received during the course of his employment with the BPD.  Further, the Government also believes that the Defendant may seek to introduce evidence of positive character traits affiliated with his role in law enforcement, such as bravery, dedication, assertiveness, and selflessness.  The Government also anticipates that the Defendant may seek to present evidence or elicit testimony about his experience in investigating crimes in Bridgeton and resulting arrests in the community.

For the reasons set forth below, the Court should exclude such evidence at trial as inadmissible under the Federal Rules of Evidence.  Moreover, to the extent certain testimony through character witnesses is permitted at trial, the

Government requests that the Court enter an order limiting its use to the appropriate form required by the evidentiary rules.

### A. Evidence of the Defendant's Good Character or Reputation is Inadmissible Under Federal Rules of Evidence 404 and 405.

Federal Rule of Evidence 404 generally prohibits the introduction of evidence of a person's character to prove that a person acted in conformity with that character trait on a particular occasion.  The rule provides a narrow exception for the admission of character evidence related to the accused, but only when the evidence relates to a "pertinent," or relevant, character trait.  See Fed. R. Evid. 404(a)(1).[1]

Assuming the criteria of Rule 404 has been met, under Rule 405,[2] evidence of a pertinent character trait generally cannot address specific instances of conduct, but rather must be in the form of testimony as to reputation or in the

---

[1]  Rule 404 provides, in pertinent part, as follows:

"(a) Character Evidence. (1) Prohibited Uses. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait. (2) Exceptions for a Defendant or Victim in a Criminal Case. The following exceptions apply in a criminal case: (A) a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it[.]"

[2]  Rule 405 provides, in pertinent part, as follows:

"(a) By Reputation or Opinion. When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.  (b) By Specific Instances of Conduct. When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct."

form of an opinion.[3]  See Fed. R. Evid. 405(a).  However, "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct."  Fed. R. Evid. 405(b).

United States v. Washington, 106 F.3d 983 (D.C. Cir. 1997) is instructive on this point.  In Washington, the defendant was an officer with the Washington, D.C. Metropolitan Police Department who was charged with bribery, firearm, and narcotics trafficking offenses that took place in connection with his position as a police officer.  Id. at 992.  The defendant sought to introduce evidence of several commendations he received for his work while on the police force.  Id. at 999. The appellate court upheld the district court's ruling excluding the evidence under Rules 404(a)(1) and 405, finding that: "the commendations were not admissible under either Rule because appellant's 'dedication, aggressiveness and assertiveness' in investigating drug dealing and carjacking is neither 'pertinent' to nor an 'essential element' of his supposed lack of predisposition to engage in the corrupt criminal activity with which he was charged."  Id.

Similarly, United States v. Nazzaro, 889 F.2d 1158 (1st Cir. 1990) also rejected a defendant police officer's request to admit certain character evidence related to positive attributes and good works he undertook as a police officer.  In

---

[3] As noted in the Advisory Committee Notes to Rule 405: "evidence of specific instances of conduct is the most convincing.  At the same time it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time.  Consequently the rule confines the use of evidence of this kind to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry."  Fed. R. Evid. 405, *Adv. Cmt. Notes.*

Nazzaro, the defendant was charged with mail fraud and perjury related to his role in a scheme to obtain advanced copies of civil service examinations and their subsequent sale.  Id. at 1160.  At trial, the defendant attempted to offer into evidence his resume and other anecdotal proof of commendations he received for his military service and as a police officer, as well as a medal bestowed upon him for special valor.  Id. at 1168.  The appellate court affirmed the ruling excluding such evidence, noting that "the traits which [the materials] purport to show—bravery, attention to duty, perhaps community spirit—were hardly 'pertinent' to the crimes of which Nazzaro stood accused."  Id.

Moreover, trial courts in the Third Circuit have arrived at similar rulings. In United States v. Fumo, 504 F.Supp.2d, 6 (E.D. Pa. 2007), former Pennsylvania state senator Vincent Fumo was charged with fraud, obstruction of justice, and criminal conspiracy related to his misuse of state funds for his personal benefit. The Government's pretrial motion to exclude the introduction of the senator's legislative, policymaking, and constituent servicing accomplishments as impermissible character evidence under Federal Rules of Evidence 404 and 405 was granted.  (See Docket Nos. 253, 294); see also Boyer v. City of Philadelphia, 2019 WL 920200 at *9 (E.D. Pa., Feb. 25, 2019) (finding that "testimony that plaintiff had previously handled evidence appropriately or had a reputation for doing so is not admissible to show that plaintiff handled evidence appropriately during the arrest which led to his termination.").

Here, just as in Washington, Nazzaro, Fumo, and Boyer, any character evidence offered to prove the generally "good" character of the Defendant—such

9

as his alleged bravery, effectiveness, attention to duty, commitment to public service, kindness, professionalism, dedication, etc.—is not admissible under Rules 404(a) and 405 because it is not pertinent to the civil rights and obstruction charges at issue. Moreover, evidence or testimony about the Defendant's prior good works or community service are likewise inadmissible under the evidentiary rules and aforementioned precedent.

Similarly, any evidence that may be proffered by the Defendant at trial as to his prior arrest record and role in successfully investigating crime with the BPD is also inadmissible because it does not relate to the charges contained in the Indictment. Indeed, whether the Defendant previously conducted arrests without incident is not pertinent to any element of the civil rights and obstruction crimes with which he is presently charged. Such evidence would only serve to influence the jury on an improper basis.[4] Accordingly, the Court should deny any request from the Defendant to introduce such evidence at trial.[5]

---

[4] This Court should also exclude any argument that the jury should acquit the Defendant based upon sympathy or the Defendant's good character. Such argument is tantamount to jury nullification. See e.g., United States v. DeMuro, 677 F.3d 550, 565-66 (3d Cir. 2012) (lower court did not abuse its discretion in excluding evidence of civil remedies in tax case because such evidence "opened the door to jury nullification").

[5] Moreover, in addition to Rules 404(a)(1) and 405, any such character evidence would likewise be inadmissible under Rules 401 and 403 of the Federal Rules of Evidence as irrelevant and unduly prejudicial to the Government. See United States v. Warner, 396 F. Supp. 2d 924, 941 (N.D. Ill. 2005) (rejecting former Illinois governor's claim that his "personal integrity and dedication to promoting the common good through public service" constitutes a character trait admissible under Rule 401(a)(1)), aff'd, 498 F.3d 666 (7th Cir. 2007). Here, any evidence as to the Defendant's good character has nothing to do with whether he violated the Victim's civil rights or whether he submitted a false police report. This evidence would also be unduly prejudicial to the Government and could

10

### B.   If Certain Character Evidence is Permitted at Trial, It Must be Limited in Form to Testimony as to the Witness's Opinion of the Defendant or the Defendant's Reputation.

The Rules of Evidence allow a defendant to offer evidence of his good character to show, by inference, that the act with which he is charged is inconsistent with his overall character. See Fed. R. Evid. 404(a)(1); 1A J. Wigmore, Evidence, § 56, at 1161 (Tillers rev. 1983). However, even when character evidence may be admissible and potentially probative, the federal evidentiary rules still limit its use at trial. As noted above, assuming the criteria of Rule 404 has been met, under Rule 405, evidence of a pertinent character trait cannot address specific instances of conduct, but rather must be in the form of testimony as to reputation or opinion on direct examination. See Fed. R. Evid. 405(a); Michelson v. United States, 335 U.S. 469, 477 (1948). On cross-examination, however, the Court may allow inquiry into relevant specific instances of the accused's conduct. See Fed. R. Evid. 405(a).

Here, to the extent the Court permits the Defendant to call certain witnesses to testify that the acts with which he is charged are inconsistent with his overall character,[6] any such questions on direct examination must be in the

---

confuse or mislead the jury, as its admission at trial could have a tendency to suggest that the jury make a decision on an improper basis. See Fed. R. Evid. 403, *Adv. Comm. Notes* ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

[6]  The Court has broad discretion to limit the number of character witnesses allowed by the Defendant. See United States v. Sullivan, 803 F.2d 87, 90 (3d Cir. 1986) (district court did not abuse its discretion in excluding defendants' judicial character witnesses on grounds that testimony was cumulative); United States v. Johnson, 730 F.2d 683, 688 (11th Cir. 1984) (affirming district court's

form of reputation or opinion testimony and cannot inquire into specific instances of the Defendant's conduct and character under Rule 405(a).  See Michelson, 335 U.S. at 477 ("The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits[.]").  For example, a witness could testify that he is familiar with the Defendant's reputation and that the Defendant has a reputation for being an honest person.  The witness cannot, however, refer to any specific instances of good conduct or honesty engaged in by the Defendant.  See id. ("The witness is [ ] allowed to summarize what he has heard in the community . . . [t]he evidence which the law permits is not as to the personality of the defendant but only as to the shadow his daily life has cast in his neighborhood.").

Moreover, to the extent the Defendant calls any character witnesses to testify on his behalf, the Government would then be permitted to inquire into certain relevant specific instances of the Defendant's conduct on cross-

---

decision to limit number of character witnesses to three).  Indeed, limiting the number of defense character witnesses is a common practice that is within the court's discretion.  United States v. Gray, 105 F.3d 956, 963 (5th Cir. 1997) (affirming district court's decision to limit defendant to two character witnesses and noting that "[t]his court has repeatedly allowed a maximum of three character witnesses"); United States v. Benefield, 889 F.2d 1061, 1065 (11th Cir. 1989) (affirming decision to reduce the defendant's character witnesses from ten to five); United States v. Koessel, 706 F.2d 271, 275 (8th Cir. 1983) (affirming district court's limitation of three character witnesses).  Here, the Government is not requesting that the Court limit the Defendant to calling a specific number of character witnesses.  Rather, at the appropriate time, the Government requests that the Court ask the Defendant to make a proffer to these witnesses' testimony, and to limit the number of character witnesses based on that proffer.

examination.[7]  See Fed. R. Evid. 405(a) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."). This is because "[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him . . . . Thus, while the law gives [the] defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans." Michelson, 335 U.S. at 477.  Accordingly, should the Defendant open the door to his character by calling character witnesses, the Government should be permitted on cross-examination to inquire about specific instances of his conduct to test the witnesses' knowledge and credibility.

## II. LAY WITNESSES SHOULD BE PERMITTED TO TESTIFY ABOUT THE DIRECT OBSERVATIONS AND PERCEPTIONS OF THE DEFENDANT'S INTERACTIONS WITH DRUMMOND.

The Government respectfully moves this Court for an order allowing the other BPD officers, who participated in the arrest of the Victim, to offer opinions

---

[7]  If the Court were to allow the Defendant to present the above-specified good character evidence, there are certain specific instances of conduct about which the Government would seek to inquire.  See United States v. Logan, 717 F.2d 84, 87-88 (3d Cir. 1983) ("by introducing evidence of his good character, the defendant 'throw[s] open the entire subject] of his character and, consequently, allows the prosecutor to…cross-examine the defendant's character witnesses and to probe the extent and source of their opinions."). The Government is not enumerating these herein to avoid any unnecessary public airing of these facts.

about the Defendant's use of force and any resulting medical injuries sustained by the victim.

Rule 701 of the Federal Rules of Evidence permits lay witnesses to give opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

It is proper for a lay witness to explain to the jury his "analysis of facts which would tend to support a jury finding on the ultimate issue." United States v. Keys, 747 F. App'x 198, 207 (5th Cir. 2018) (unpublished) (internal quotations omitted) (quoting United States v. Buchanan, 70 F.3d 818, 833 n.20 (5th Cir. 1995)).

Similarly, it is proper for officer-witnesses to testify to "opinion[s] regarding specific factual building blocks" that can support a jury finding that the Defendant did not act reasonably. Id. at 209-11 (citing United States v. Speer, 30 F.3d 605, 610 (5th Cir. 1994)). "Federal Rule of Evidence (FRE) 701 allows non-expert testimony in the form of an opinion or inference if that testimony is (1) rationally based on his perception, (2) helpful to achieving a clear understanding of the testimony or the determination of a fact issue, and (3) not based on scientific, technical, or other specialized knowledge." United States v. Espino-Rangel, 500 F.3d 398, 400 (5th Cir. 2007).

A law-enforcement witness to a crime may testify about his opinion of the defendant's conduct—even when it "embraces an ultimate fact issue to be

determined by the factfinder." Espino-Rangel, 500 F.3d at 400; see also United States v. Churchwell, 807 F.3d 107, 119 (5th Cir. 2015) (lay opinion testimony as to defendant's honesty was admissible, even though closely related to the ultimate issue, because witness "was in a unique position to observe [defendant's] demeanor"); Keys, 747 F. App'x at 210-11 (affirming trial court's admission of law-enforcement witness's opinion that defendant in a sex-trafficking of a minor trial had the opportunity to observe the girls—and thereby should have known they were minors—because the testimony was an "opinion of fact"); United States v. Umbach, 708 Fed. Appx. 533, 545 (11th Cir. 2017) (describing the court's consistent holding that a law-enforcement witness could answer question of whether they saw anything that "justified [the defendant's] use of force" because the answer was relevant to the determination of a fact in issue, was based upon the witness's personal perception, and was based upon the witness's experience on the police force).

The witnesses at issue here are not experts, but are fact witnesses who were on scene and were actively participating in Drummond's arrest when the Defendant pepper-sprayed him. These witnesses' status as fact witnesses, rather than experts, is significant and renders their opinions and assessments more helpful to the jury in determining whether the Defendant committed a crime on the day in question. See Espino-Rangel, 500 F.3d at 400 (FRE 704's ban on expert opinions as to defendant's mental state not applicable to fact witnesses); United States v. Perkins, 470 F.3d 150, 157-60 (4th Cir. 2006) (concluding that

witness's on-scene assessments and opinions are helpful and may be presented to the jury).

The District Court in <u>United States v. Cowden</u> addressed the issue of whether officers who observed a defendant police officer's unlawful use of excessive force could give lay opinion regarding his conduct.  <u>See</u> <u>United States v. Cowden</u>, 2016 WL 5794763, at *5 (N.D. W. Va. Oct. 4, 2016).  In that case, the officer-defendant sought to preclude lay witnesses, including other officers at the scene, from offering opinions about the officer's use of force and any resulting medical injuries sustained by the victim. <u>Id.</u> The court denied the defendant-officer's motion, finding that the witnesses' opinion testimony was not precluded by Rule 701 and did not fall within the specialized knowledge requirements triggering Rule 702.  <u>Id.</u> Accordingly, the <u>Cowden</u> Court permitted the government to offer testimony from the other officers as to what they "observed or perceived as to both the defendant's use of force and the arrestee's injuries." <u>Id.</u>

This Court should adopt the same approach as <u>Espino-Rangel</u> and <u>Cowden</u>. The Government plans to call witnesses present at the scene of the assault, which will include other officers who observed the incident.  Just as in <u>Espino-Rangel</u>, <u>Umbach,</u> and <u>Cowden</u>, these witnesses should be permitted to testify about what they observed and perceived about the Defendant's use of force, the Victim's injuries, and whether any alternate techniques of restraining the Victim could have been used.  This testimony is not expert testimony, but rather is merely opinion based upon the witnesses' direct observations and

perceptions. See Fed. R. Evid. 701(a) ("[T]estimony in the form of an opinion is limited to one that is rationally based on the witness's perception[.]"). The testimony will also help the jury to "clearly understand[]" and "determin[e] a fact issue"—i.e., whether the Defendant's use of force was excessive and deprived the Victim of his civil rights.

## III.   DESIGNATION OF WITNESSES AS HOSTILE

The Government may request the Court to declare certain prosecution witnesses as "hostile" to the Government and permit examination of those witnesses accordingly. Specifically, the Government intends to call in its case-in-chief several of the BPD officers who participated in Drummond's arrest. Those persons are eyewitnesses to the most crucial events in this case. Because those officers served with the Defendant on the BPD, and some had worked directly with him, they are likely to be sympathetic to him and hostile to the prosecution, particularly with respect to his conduct on the day of the events at issue here.

Federal Rule of Evidence 611(c) regulates the use of leading questions. It states:

> (c) Leading Questions. Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions:
>
> (1) on cross-examination; and
>
> (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.

Fed. R. Evid. 611(c).

"The prohibition against leading is inapplicable to hostile or biased witnesses, or to witnesses who sympathize with the opponent's cause or are unwilling for any other reason to reveal what they know." 4 Weinstein's Federal Evidence, § 611.06 (2019). "The requisite degree of hostility, bias, or reluctance of a witness must usually be demonstrated to the satisfaction of the court." <u>Id.</u> "However, Rule 611(c)(2) provides that certain categories of witnesses can automatically be treated as hostile." <u>Id.</u> "The language in Rule 611(c)—'witness identified with' an adverse party—is intended to enlarge the class of persons who can be regarded as hostile without further demonstration, though their membership in the group will still have to be shown." <u>Id.</u>

"The normal sense of a person 'identified with an adverse party' has come to mean, in general, an employee, agent, friend, or relative of an adverse party." <u>Ratliff v. City of Chicago</u>, 2013 WL 3388745, *6 (N.D. Ill. July 8, 2013) (quoting <u>Washington v. State of Illinois Depart. of Revenue</u>, 2006 WL 2873437, *1 (C.D.Ill. Oct.5, 2006) and <u>Vanemmerik v. The Ground Round, Inc.</u>, 1998 WL 474106, *1 (E.D.Pa.1998)).

Here, there can be little dispute that the police officers who were working with the Defendant on June 18, 2017 are "identified with" the Defendant. They served in the same police department with him, were working the same shift as him on the day of the events at issue, and some knew him personally. In <u>Ellis v. City of Chicago</u>, 667 F.2d 606 (7th Cir.1981), the Seventh Circuit held that a Chicago police officer who witnessed the incident at issue "clearly qualified" as a witness identified with an adverse party pursuant to Federal Rule of Evidence

18

611(c). Id. at 613 (noting that "police officers [who] were employees of defendant City of Chicago at all times during the litigation and were each present during portions of the incident which gave rise to this lawsuit …. clearly qualified as "witness(es) identified with an adverse party" for purposes of Rule 611(c)").

Notwithstanding that the police witnesses are in a group that is inherently hostile to the prosecution in which a fellow officer is the defendant, the Government is not seeking a declaration before trial that any of the police witnesses are hostile. Rather, it will evaluate their hostility based on their answers during direct examination. If any of those witnesses demonstrate hostility in the view of the Government, it will seek a declaration of hostility at that point and permission to question the witness with leading questions.

## IV.    THE COURT SHOULD ALLOW REFERENCE AT TRIAL TO THE SUBSEQUENT DEATH OF THE VICTIM.

On April 2, 2022, the Victim died. The Government seeks to introduce the Victim's death certificate, a copy of which is attached as Exhibit 1,[8] so that the jury will not be inclined to speculate as to the reason why the Government has not presented the Victim's testimony.  It is relevant, and therefore admissible, in order to explain the absence at trial of this central figure. See Fed. R. Evi. 401, 402.

---

[8] Because the death certificate contains personal information about the Victim and his family, the Government will supply a copy of Exhibit 1 to chambers and to opposing counsel via email, but will not file Exhibit 1 on the docket. The Government will make available to the Court and opposing counsel the original, unredacted certificate bearing a raised seal once it is received.

The Government has requested a certified copy of death certificate that will bear the raised Great Seal of the State of New Jersey.  The attached exhibit is a Certificate of Death that was "issued for informational purposes only."  The Death Certificate was issued on May 11, 2022.  The Official Sealed Document by the New Jersey Department of Health, Office of Vital Statistics and Registry will be a self-authenticating document under Fed. R. Evi. 902(1) (Domestic Public Documents That Are Sealed and Signed) and/or 902(4) (Certified Copies of Public Records).  See, e.g., United States v. Jones, 2016 WL 10704381, at * 3 (E.D. La. Feb. 17, 2016) (birth certificate produced to defense counsel in redacted form, provided to the government by a governmental entity, and containing a seal of the department of State and a signature purporting to be an execution or attestation admissible as self-authenticating document under Fed. R. Evi. 902(1)); United States v. Hall, 2017 WL 6527150, at *4 (M.D. Pa. Dec. 21, 2017) (citing Fed. R. Evid. 902(4) for the proposition that "the court can accept certified copies of public records as self-authenticating").

The death certificate establishes that the Victim died on April 2, 2022, from liver failure. References to the Victim's subsequent death are necessary for the jury to assess trial testimony without confusion, speculation, or undue prejudice against the Government. Thus, the Government requests that any reference to the Victim's death be admitted under Federal Rule of Evidence 401 and Rule 403.

Rule 401 provides the test for admissible evidence at trial, stating that only relevant evidence—i.e., evidence that has any tendency to make a fact more or

less probable than it would be without the evidence, or evidence that is of consequence in determining the action—should be admissible. Fed. R. Evid. 401. The rule does not require that the evidence prove an act in order to be admissible, but rather only requires that, with the inclusion of the evidence, one is more likely to conclude that the act occurred than without it. See United States v. Aranda-Diaz, 31 F. Supp. 3d 1285, 1296 (D.N.M. 2014) ("[R]ule 401 provides a low hurdle for finding evidence relevant.")

Relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403. The probative value of the death certificate, as redacted, outweighs any possible undue prejudice.  It should therefore be admitted to prove that the Victim is recently deceased, from a cause bearing no relation to the events alleged in the Indictment, and thus cannot be called by either side to testify.

"Evidence should be excluded under Rule 403 only sparingly since the evidence excluded is concededly probative," and the balance "should be struck in favor of admissibility." Spain v. Gallegos, 26 F.3d 439, 453 (3d Cir. 1994). In determining the probative value of evidence under Rule 403, the court "must consider not only the extent to which it tends to demonstrate the proposition which it has been admitted to prove, but also the extent to which that proposition was directly at issue in the case."  United States v. Herman, 589 F.2d 1191, 1198 (3d Cir. 1978).  The absence of the Victim—and the failure of

21

the Government to explain that absence— may be argued by the defense as a way to raise reasonable doubt as to the defendant's guilt.

While the Victim's death was unrelated to the Incident and occurred years after the Incident, knowledge of the Victim's death is relevant for the jury's consideration. The Victim's personal experience is a key part of the crimes alleged in the Incident. Without knowing that the Victim is dead and therefore unable to testify, the jury will likely speculate about why the Victim himself is not testifying. This speculation and confusion may cause the jury to be biased against the Government by believing the Government's case is less credible without testimony directly from the Victim. See United States v. Lawson, 494 F.3d 1046, 1053 (D.C. Cir., 2007) (finding that a "jury may infer that a witness who 'potentially has so much to offer that one would expect [him] to take the stand' but is not called would have given testimony harmful to a party that had 'special ability to produce him at trial'").

Therefore, the admission of any evidence related to the subsequent death of the Victim is acceptable under Rules 401 and 403, and the Court should enter an order allowing its admission and use at trial.

## V. THIS COURT SHOULD BAR ANY EXPERT OPINION TESTIMONY THAT GRIER'S CONDUCT DID NOT VIOLATE DRUMMOND'S CIVIL RIGHTS.

The Government respectfully moves this Court to bar the testimony of the Defendant's expert. On April 18, 2022, the Defendant advised that he intended to call Emmanuel Kapelsohn, Esquire as an expert in police use of force.  On April 19, 2022, defense counsel provided Mr. Kapelsohn's curriculum vitae. To

date, the Defendant has failed to comply with Rule 16 and provide an expert report.[9]

Federal Rule of Criminal Procedure 16(b)(1)(C) provides that the "defendant must, at the government's request, give to the government a written summary of any [expert] testimony that the defendant intends to use," and that summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Although the Rule does not include a deadline for disclosure, the Court's scheduling order in this case required the defendant to provide discovery under Rule 16(b)(1) by June 30, 2022.  DE 20 at ¶ 4. The Government also specifically requested expert disclosure in its discovery letter dated August 10, 2021.  Accordingly, the Court should bar the defense from presenting Mr. Kapelsohn's testimony for failing to comply with Rule 16.

## VI.   THE COURT SHOULD PRECLUDE ANY REFERENCE TO POSSIBLE PUNISHMENT OR COLLATERAL CONSEQUENCES OF CONVICTION.

The Government respectfully moves this Court for an order precluding the Defense from referring—whether directly or indirectly—to issues concerning possible punishment should the Defendant be convicted on any or all of the counts in the Indictment. This preclusion should extend to discussion or mention of possible collateral consequences, such as potential impact on the Defendant's livelihood or ability to possess firearms.  This preclusion should

---

[9] On August 19, 2022, almost two months after it was due and the day that Motions in Limine were due, the defense provided a copy of an expert report. Accordingly, the Government requests leave to supplement its Motions regarding the province of the expert's testimony.

apply to all statements by counsel, evidence or exhibits presented in the jury's presence.

In a federal criminal trial, the jury's sole function is to determine guilt or innocence.  Evidence regarding punishment or the effects of conviction is thus irrelevant and inadmissible before the jury.  The punishment provided by law upon conviction of a criminal violation is improper for a jury to consider when resolving the guilt phase of a trial.  See, e.g., Beavers v. Lockhart, 755 F.2d 657, 662 (8th Cir. 1985) ("Historically, the duty of imposing sentence has been vested in trial judges."); United States v. Brown, 744 F.2d 905, 909 (2d Cir.), cert. denied, 431 U.S. 941 (1977) (defendant has no constitutional right to have punishment assessed by a jury).

Calling penal issues to the jury's attention creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to unduly impact their deliberations.  "The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged."  Shannon v. United States, 512 U.S. 573, 579 (1994). Information regarding the consequences of a verdict is irrelevant to the jury's task and should be inadmissible; Pope v. United States, 298 F.2d 507, 508 (5th Cir. 1962); see also Rogers v. United States, 422 U.S. 35, 40 (1975); United States v. Greer, 620 F.2d 1383, 1385 (10th Cir. 1980) (absent a statutory requirement that the jury participate in the sentencing decision, nothing is left for the jury determination beyond the guilt or innocence of the accused).

24

Evidence which relates to the issue of punishment upon conviction of a criminal offense would not tend to prove or disprove any fact of consequence to the jury's determination of guilt or innocence, such evidence is not "relevant" under Federal Rules of Evidence 401 and 402, and should therefore be excluded. Thus, the Government requests that the Defense be precluded from referring to either the penalty, possible sentence, sentencing range or possible collateral consequences of conviction.

## VII.   THE COURT SHOULD ALLOW ADMISSION OF PRIOR GRAND JURY TESTIMONY AS SUBSTANTIVE EVIDENCE AS NEEDED.

The Government respectfully moves this Court to admit prior grand jury testimony of witnesses who testified before the grand jury, in the case that these witnesses answer elusively, claim memory loss or equivocate during their trial testimony. This admission should extend to statements that are inconsistent, partially different or incomplete. This admission should also extend to claims of memory loss that this Court finds disingenuous.

Rule 801(d)(1)(A) of the Federal Rules of Evidence allows sworn prior inconsistent statements to be admitted as substantive evidence if the declarant is available for cross-examination in the current proceeding. See Fed. R. Evid. 801(d)(1)(A). It is well established that inconsistent testimony can include poor memory of events, equivocation, and claims of memory loss and need not be diametrically opposed to the witness' prior statement to be inconsistent. See United States v. Mornan, 413 F.3D 372, 379 (3d Cir. 2005) (affirming trial court's admission of a witness' prior statement where the trial court concluded witness' memory loss was less than genuine, and joining the Fifth, Seventh and Eighth

Circuits in so holding); <u>United States v. Mayberry</u>, 540 F.3d 506, 515 (6th Cir. 2008) (allowing grand jury testimony as substantive evidence in response to a witness' memory loss); <u>United States v. Tran</u>, 568 F.3d 1156, 1163 (9th Cir. 2009) (admitting portions of a witness's inconsistent statements from an earlier plea agreement into evidence when witness's testimony at trial was "reluctant and evasive").

While the Third Circuit has noted that a prior statement should not be admitted if the witness has genuine memory loss at trial regarding the statement, <u>United States v. Palumbo</u>, 639 F.2d 123, 128 n.6 (3d Cir. 1981), it has held that a prior statement may be admitted under Rule 801(d)(1)(A) if the witness's memory loss is disingenuous. <u>Mornan</u>, 413 F.3d at 379. <u>See</u> <u>also</u> <u>United States v. Odom</u>, 627 F.App'x 151, 153-54 (3d Cir. 2015) (not precedential) (a district court's decision to admit grand jury testimony as prior inconsistent statement was not an abuse of discretion because the district court, acting within its discretion, likely viewed the witness's claims of memory loss as disingenuous); <u>United States v. Gerard</u>, 507 F.App'x 218, 221-22 (3d Cir. 2012) (not precedential) (admitting grand jury testimony as a prior inconsistent statement under Rule 801(d)(1)(A) when a witness's trial testimony was completely opposite of her detailed, first-person statements during her appearance at the grand jury); <u>United States v. Iglesias</u>, 535 F.3d 150, 159 (3d Cir. 2008) (considering testimony inconsistent for purposes of Rule 801(d)(1)(A) when a witness shows "manifest reluctance to testify" and "forgets" certain facts at trial); <u>United States v. Bigham</u>, 812 F.2d. 943, 946-47 (5th Cir. 1987) (admitting prior grand jury testimony in

the event of an evasive and reluctant witness, and holding that the trial judge reasonably could have concluded that the witness' memory loss was disingenuous); United States v. Williams, 737 F.2d 594, 608 (7th Cir. 1984) (for an uncooperative witness, allowing lack of memory as inconsistent with detailed grand jury testimony); United States v. Thompson, 708 F.2d 1294, 1302 (8th Cir. 1983) (allowing the district court significant discretion in determining if evasive answers are inconsistent with previously given statements). Accord United States v. Owens, 484 U.S. 554, 565 (1988) ("It would seem strange… to assert that a witness can avoid introduction of testimony from a prior proceeding… by simply asserting lack of memory of the facts to which the prior testimony related.").

The trial judge has broad discretion to determine if an evasive answer is inconsistent with the statements made in a prior proceeding. This discretion furthers the policy behind Rule 801(d)(1)(A), which is to "provide a party with desirable protection against the turncoat witness who changes his story on the stand and deprives the party of calling him of evidence essential to his case." Bigham, 812 F.2d at 946-47. See also United States v. Murphy, 696 F.2d 282, 284 (4th Cir. 1982). Therefore, partial or unclear recollection is considered inconsistent with total or definite recollection. United States v. Distler, 671 F.2d 954, 958 (6th Cir. 1981); see also Williams, 737 F.2d at 608 (admitting grand jury testimony where a witness claimed partial memory loss in his trial testimony); United States v. Marchand, 564 F.2d 983, 999 (2nd Cir. 1977); United States v. Rogers, 549 F.2d 490, 495-96 (8th Cir. 1976).

Furthermore, a complete answer to a question may be considered as inconsistent to a partial reply as a completely different reply. Argnellino v. New Jersey, 493 F.2d 714, 730 (3d Cir. 1974). If a prior statement indicates that, at an earlier time, the witness remembered the events about which he testified with more certainty or in more detail, then it is permissible under Rule 801(d)(1)(A) to admit the prior statement when the witness recalls the event incompletely or with some equivocation at trial. Distler, 671 F.2d at 958.

The Government respectfully requests this Court to admit prior grand jury testimony as substantive evidence if this Court disbelieves a witness' claims of memory loss, or if a witness fails to testify about details previously provided during a grand jury appearance, or does to in a way that is inconsistent with their grand jury testimony.

## VIII.   THE   JURY   SHOULD   RECEIVE   THE   INDICTMENT   DURING DELIBERATIONS.

The Court should provide the jury with a copy of the Indictment during its deliberations.  This Court has the discretion to allow the jury to receive the Indictment.  See, e.g., United States v. Todaro, 448 F.2d 64, 66 (3d Cir. 1971); 3d Cir. Model Criminal Jury Instruction 3.07, comment ("Trial Court Discretion to Allow Jury to Have Indictment During Deliberations").  The only question is whether the Court should allow it.  The Government submits that the Court should allow the jury to have the Indictment during its deliberations.  "Giving the jury a copy of the indictment appears to be common practice." United States v. Roy, 473 F.3d 1232, 1237 n.2 (D.C. Cir. 2007) (citing Ralph A. Jacobs, White Collar Pretrial Motions, 16 Litig., Jan. 1990, at 17, 20).  The Indictment will

assist the jury in its deliberations.

## IX. LAW ENFORCEMENT ATTENDING TRIAL SHOULD BE BARRED FROM WEARING UNIFORMS OR OTHER RECOGNIZABLE ITEMS IN THE COURTROOM SO AS NOT TO UNDULY INFLUENCE OR INTIMIDATE THE JURY.

The Government anticipates that, in the absence of a rule prohibiting law enforcement from attending the trial in uniform, many officers will do so due to the nature of the charges and their serving alongside the Defendant.  This presence of uniformed police in the courtroom may unduly influence or intimidate the jury.  Thus, the Government requests that the Court issue a rule that courtroom spectators should not wear a uniform, badge, and/or any other items that would identify them as law enforcement officers during trial.

The Supreme Court has acknowledged the effect uniformed officers may pose to the prospects of a fair trial. Holbrook v. Flynn, 475 U.S. 560, 570–71 (1986)( "We do not minimize the threat that a roomful of uniformed and armed policemen might pose to ... chances of receiving a fair trial"). The presence of uniformed officers at a trial involving an officer as either a victim or a defendant has the potential to intimidate a jury and can even warrant a retrial in some circumstances. For instance, in Woods v. Dugger, 923 F.2d 1454 (11th Cir. 1991), the Court granted habeas relief and a new trial in a prosecution for murder of a prison guard where half of the more than 40 spectators wore prison guard uniforms. The Court explained

> [t]he officers in this case were there for one reason: they hoped to show solidarity with the killed correctional officer. In part, it appears that they wanted to communicate a message to the jury.... The officers wanted a conviction followed by the imposition of the death penalty. The jury could not help but receive the message.

29

Id. at 1459-60.

The Court has the power to establish rules regarding courtroom attire and decorum to protect the integrity of the legal process. See U.S. v. Johnson, 713 F. Supp 2d 595, 617 (E.D. La. 2010) (trial court noting its own decision to allow *en masse* uniformed police presence in courtroom during guilt phase was "prejudicial" and "inappropriate"); Woods, 923 F.2d 1454 (uniformed correctional officers intending to show solidarity with a fellow correctional officer at trial required reversal).

Here, the presence of uniformed or readily identifiable law enforcement officers in the gallery of the courtroom may affect the Government's right to a fair trial and may unduly influence or intimidate jurors. Uniformed courtroom spectators may lend an air of credibility to the Defendant via their association with him. It is also possible that their presence may dissuade jurors who reside in Bridgeton from reaching a verdict against the Defendant for fear of retaliation. Uniformed courtroom spectators could also send the jury a message that a finding of guilt is "anti-police," injecting considerations which are not evidence-based and wholly inappropriate. Even if uniformed spectators do not intend to intimidate the jury, they could still unintentionally influence the verdict.

Although police spectators in this case are likely not opposing the defendant, but rather supporting him, this difference does not require a different result. See United States v. Ruiz, 579 F.2d 670, 674 (1st Cir. 1978) (in civil rights trial against police defendants, trial court required three police officers in attendance to refrain from wearing their uniforms to avoid jury intimidation).

The Government does not request that law enforcement officers be barred from attending trial.   Rather, the Government merely requests that, if law enforcement officers do attend trial, they refrain from wearing a uniform, badge, and/or any other items that would identify them as law enforcement officers to the casual observer.

Directing police officers not to wear their uniforms or badges will not impair any legitimate purpose for their attendance and will prevent possible improper prejudice. If the Court issues such an order, the Government recommends that it should do so sufficiently in advance of trial to allow Grier and his attorneys to inform any officers who might be affected by the order of its existence.

## X.   THE DEFENDANT SHOULD BE ORDERED TO PROVIDE RECIPROCAL DISCOVERY TO THE GOVERNMENT.

By letter dated August 10, 2021, the Government sought reciprocal discovery from the defense.   See Exhibit 2. The right of the Government to reciprocal discovery from the Defense is firmly established in Rule 16(b)(1)(A) and (B) of the Federal Rules of Criminal Procedure.  The former provision allows the Government, upon compliance with a legitimate request by a defendant for similar material, to:

> inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in chief at trial.

Fed. R. Crim. P. 16(b)(1)(A).  Subsection (b)(1)(B) mandates reciprocal discovery of scientific tests and subsection (b)(1)(C) requires disclosure of a summary of expert witness testimony the defendant seeks to introduce.  Under the clear language of this rule, courts uniformly have allowed reciprocal discovery.  See, e.g., United States v. Bump, 605 F.2d 548, 551-52 (10th Cir. 1979) (requiring reciprocal disclosure over defendant's objection that it would violate his constitutional rights); United States v. Sherman, 426 F. Supp. 85, 93 (S.D.N.Y. 1976).  In addition, this Court's Standing Order No. 15-2 required that "[t]he defendant shall provide all discovery required by Federal Rule of Criminal Procedure 16(b)(1) on or before June 30, 2022."  DE 20, at ¶ 3.

Since discovery has been made available to the Defense, the Government is entitled, pre-trial, to reciprocal discovery under Rule 16(b), and requests the Court to direct disclosure of any remaining discoverable information.  To the extent the Defendant has any additional discovery in his possession that has not yet been disclosed to the Government, he should be ordered to provide these materials as soon as possible.

## XI.   THE DEFENDANT SHOULD BE ORDERED TO PROVIDE PRIOR STATEMENTS OF DEFENSE WITNESSES TO THE GOVERNMENT ON THE JENCKS DISCLOSURE DATE.

The Government moves pursuant to Rule 26.2 of Federal Rules of Criminal Procedure for the production of any and all written or recorded statements of any witness the Defendant intends to call to testify at trial.  The Government seeks disclosure of these statements at the same time it will disclose Jencks and Giglio materials—that is, prior to jury selection.

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's Motions *In Limine* and Motion for Reciprocal Discovery.


Respectfully Submitted,

PHILIP SELLINGER
United States Attorney

_____
JASON M. RICHARDSON
LINDSEY R. HARTEIS
Assistant U.S. Attorneys

Dated:    August 19, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2022, I served the foregoing United States' Motions *In Limine* and Motion for Reciprocal Discovery via electronic filing on the following counsel:

Stuart J. Alterman, Esq.
Alterman & Associates, LLC
8 South Maple Avenue
Marlton, New Jersey 08053

_____
JASON M. RICHARDSON
Assistant U.S. Attorney